_____



SO ORDERED,

**Judge Jason D. Woodard**

United States Bankruptcy Judge

The Order of the Court is set forth below. The case docket reflects the date entered.
_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| ERICA STRINGER, | ) | Case No.: | 13-13430-JDW |
| | ) | | |
| Debtor. | ) | Chapter: | 13 |
| | / | | |

## MEMORANDUM OPINION AND ORDER SUSTAINING
## IN PART AND OVERRULING IN PART OBJECTION TO CONFIRMATION

This matter came before the Court for hearing on November 5, 2013, on the Objection to Confirmation of Chapter 13 Plan (the "Objection")(Dkt. # 13) filed by Third Union Finance, Inc. (the "Creditor") in the above-styled chapter 13 bankruptcy case of Erica Stringer (the "Debtor"). At the hearing on the Objection, Bart Adams, counsel for the Creditor, and William Fava, counsel for the Debtor, appeared and requested an opportunity to brief the legal issues, as the facts are not in dispute. Accordingly, an order setting a briefing schedule was entered on November 18, 2013 (Dkt. # 25).

The Creditor filed its brief on January 2, 2014 (Dkt. # 33). Also on January 2, 2014, Mississippi Consumer Finance Association ("MCFA") filed a Motion for Leave to File an *Amicus Curiae* Brief in support of the Creditor's position. The Court granted the motion, and MCFA filed its brief on January 2, 2014 (Dkt. # 32). On January 4, 2014, the Debtor filed her response brief (Dkt. # 34). On January 22, 2014, attorney Robert Gambrell filed a Motion for

1

Leave to File *Amicus Curiae* Brief in support of the Debtor's position (Dkt. # 37), which was granted by the Court (Dkt. # 38). On January 30, 2014, Mr. Gambrell filed his *Amicus Curiae* Brief in Opposition to Creditor's Objection (the "Gambrell Brief")(Dkt. # 40). The Creditor filed a reply brief to the Gambrell Brief on February 12, 2014 (Dkt. # 41). The issues presented in the Objection have now been fully briefed and are properly before the Court for resolution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc dated August 6, 1984. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A), (B), (L), and (O).

## I. FINDINGS OF FACT[1]

The following facts are undisputed (Dkt. # 33 and 34). On or about November 17, 2011, Debtor obtained a loan from Creditor (the "First Loan"). Pursuant to the terms of the First Loan, Debtor agreed to repay Creditor $845.57 in twelve monthly installments. The Debtor pledged various items of personal property as collateral to secure the First Loan. The Debtor made payments as scheduled until March 14, 2012, when she refinanced the remaining balance (the "Second Loan"). Under the terms of the Second Loan, the Debtor received additional cash and agreed to repay a total of $3,890.56. As collateral for the Second Loan, Debtor pledged the same personal property, plus a 2010 Nissan Altima (collectively, the "Collateral"). On April 13, 2012, the Debtor refinanced the Second Loan (the "Third Loan"). Under the terms of the Third Loan, the Debtor again received additional cash, again pledged the Collateral, and agreed to repay a total of $10,629.75. The Debtor made the agreed-upon payments under the Third Loan until

---

[1] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

2

March 29, 2013, when she refinanced the Third Loan (the "Fourth Loan"). Under the terms of the Fourth Loan, the Debtor again received additional cash. Altogether, the Debtor financed $6,711.96, but she agreed to repay $10,673.61, which includes a finance charge of $3,961.65. The contract rate of interest for the Fourth Loan was 27.84%. The Debtor again pledged the Collateral for the Fourth Loan. The total value of the Collateral at the time of the Fourth Loan was $12,400.[2]

On August 19, 2013, the Debtor filed her voluntary chapter 13 bankruptcy petition. Along with her petition, the Debtor also filed her proposed chapter 13 plan, in which she proposed to pay the Creditor the unpaid principal owed on the Fourth Loan, approximately $6,175.00, plus 7% interest over the 60-month life of the plan. The Creditor timely filed its objection to confirmation of the plan on September 3, 2013, arguing that as an oversecured creditor, it is entitled to its contract rate of interest, 27.84%, in order to receive the value of its claim as required by § 1325(a)(5)(B)(ii).[3] Hence, the only issue for the Court to decide is the proper interest rate(s) to be applied to the Creditor's claim.

## II.    CONCLUSIONS OF LAW

### A. Pre-Confirmation Interest

There are two distinct periods during which a secured creditor may be entitled to interest in a chapter 13 case – (1) post-petition but pre-confirmation[4] (the "interim period"), and (2) post-confirmation. Typically, once a bankruptcy case is filed, a creditor is not entitled to interest on its claim during the interim period. Section 506(b) of the Bankruptcy Code is an exception to

---

[2] Although the parties have not stipulated to or addressed the exact value of the Collateral on the petition date or thereafter, they agree that the Creditor's claim remains oversecured.

[3] All statutory references are to Title 11, United States Code (the "Bankruptcy Code," or the "Code"), unless otherwise indicated.

[4] Put simply, "post-petition but pre-confirmation" means after the bankruptcy petition is filed, but before the chapter 13 plan is confirmed by an order entered by the court.

3

this general rule, providing that a creditor whose claim is secured by property with a value greater than the amount of its claim is allowed "interest on such claim." Although oversecured creditors are entitled to interest during the interim period, the Bankruptcy Code does not specify the interest rate to which such oversecured creditors are entitled. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989). Interest at the contract rate is not mandated by § 506(b), and, indeed, even oversecured creditors who hold nonconsensual liens are entitled to interest under § 506(b), though there is no underlying agreement providing for interest. *Ron Pair*, 489 U.S. at 241. While *Ron Pair* is clear that § 506(b) does not require interim period interest to accrue at the contract rate, the case is silent as to what rate should apply.

The United States Court of Appeals for the Fifth Circuit, relying upon pre-Code law, has held that when an oversecured creditor's claim arises from a contract, the contract provides the interim period interest rate. *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir. 1992). Accordingly, binding precedent in the Fifth Circuit is clear that an oversecured creditor is entitled to interest at the contract rate during the interim period. As the parties agree that the Creditor's claim is oversecured in this case, the Creditor is entitled to interim period interest at the contract rate, 27.84%.

The Court's inquiry into the appropriate interest rate does not end here, however, because "§ 506(b) applies only from the date of filing through the confirmation date." *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 797 (5th Cir. 1997)(citing *Rake v. Wade*, 508 U.S. 464, 468 (1993), superseded on other grounds by statute, 11 U.S.C. 1322(e). *See also First United Sec. Bank v. Garner (In re Garner)*, 663 F.3d 1218, 1221 (11th Cir. 2011); *Countrywide Home Loans, Inc. v. Hoopai (In re Hoopai)*, 581 F.3d 1090, 1099 (9th Cir. 2009); *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1338-

39 (11th Cir. 2000); *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 425 (2d Cir. 1998). Section 506(b), in conjunction with § 506(a), effectively establishes the amount of the claim on the date of confirmation, but not the post-confirmation interest rate that accrues on the claim. *Garner*, 663 F.3d at 1220. While the Creditor is clearly entitled to post-confirmation interest, this entitlement is not prescribed by § 506(b), which has no applicability beyond the plan confirmation date.

### B. Post-Confirmation Interest

"Chapter 13 expressly authorizes a bankruptcy court to modify the rights of any creditor whose claim is secured by an interest in anything other than real property that is the debtor's principal residence." *Till v. SCS Credit Corp,* 541 U.S. 465, 474 (2004)(citing § 1322(b)). Accordingly, through the plan confirmation process, a court may "modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract." *Id.* Section 1325 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 13 plan, and, specifically, § 1325(a)(5) contains the requirements for the treatment of a secured claim. In order to be confirmed, a chapter 13 debtor's plan must provide for each secured creditor in one of three ways. First, the creditor may consent to its treatment under the plan. 11 U.S.C. § 1325(a)(5)(A). The Creditor has not done so here. Second, a debtor may surrender the collateral securing the creditor's claim. 11 U.S.C. § 1325(a)(5)(C). The Debtor does not propose to do so here. The third alternative, commonly known as a "cram down," is the option proposed by the Debtor in this case. To utilize the cramdown option, the affected secured creditor must receive a distribution of property over the life of the plan with a present value of not less than the allowed amount of its secured claim. 11 U.S.C. § 1325(a)(5)(B); *In re Pryor*, 341 B.R. 648 (Bankr. C.D. Ill. 2006). Property distributions under § 1325(a)(5)(B) most often

5

take the form of a stream of future payments over the chapter 13 plan term. *Rake*, 508 U.S. at 472 n.8.

A creditor receives the "present value" of its claim "only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Rake*, 508 U.S. at 472 n.8. In other words, § 1325(a)(5)(B) requires that a secured creditor's claim must be paid either in full at the time of confirmation, or over time with interest. *DaimlerChrysler Servs. N. Am., LLC v. Taranto (In re Taranto)*, 365 B.R. 85, 89 (B.A.P. 6th Cir. 2007)(citing *Till,* 541 U.S. at 473-74). Accordingly, in a cramdown situation, on the confirmation date, the amount of the claim is set pursuant to § 506(a) and (b), and all secured creditors, regardless of the extent of their security, are entitled to post-confirmation interest on their allowed secured claims for the duration of the plan or until their claims are paid in full pursuant to § 1325(a)(5)(B), whichever occurs first. Section 1325 does not establish the appropriate interest rate, but simply requires that interest accrue and be paid in a case such as the Debtor's.

### 1. Cram Down vs. Strip Down

The Creditor in this case makes a common error in relying on § 506, confusing "cram down" with "strip down." As discussed above, "'cram down' is a term that refers to confirmation of a chapter 13 plan over the objection of the holder of a [secured] claim." *In re Wright*, 338 B.R. 917, 919 (Bankr. M.D. Ala. 2006)(citing *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957 (1997)). The term "strip down" refers to the bifurcation of a claim into secured and unsecured components under § 506(a). *Wright,* 338 B.R. at 919. The secured claim is "stripped down" to the value of the collateral, with the remaining portion of the debt treated as

unsecured. 11 U.S.C. § 506; *Dewsnup v. Timm*, 502 U.S. 410, 414-15 (1992). In most cases, § 1325(a)(5)(B) interest is paid on the secured portion of the claim, whereas no interest is paid on the unsecured portion.

The Creditor attempts to conflate the claim allowance determination of § 506 with a plan confirmation requirement of § 1325. As noted by the Fifth Circuit, the "muddling of the two provisions is problematic because they are two distinct provisions of the Bankruptcy Code and they operate independently of each other, although debtors frequently employ both of them when restructuring their claims under Chapter 13." *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 347 n.9 (5th Cir. 2008).

Oversecured creditors, such as the Creditor herein, are entitled to interim period interest pursuant to § 506(b), as set forth above. At confirmation, the interest rate payable on a crammed-down secured claim is governed by § 1325(a)(5)(B)'s present-value requirement. Section 506(b) no longer has any application post-confirmation. *T.H. New Orleans*, 116 F.3d at 797. The question in this case, then, is what is the appropriate interest rate to be applied to the Creditor's secured claim post-confirmation?

### 2. Post-Confirmation Interest under *Smithwick*

The Fifth Circuit first considered the appropriate interest rate for secured claims in chapter 13 cram down cases in *Green Tree Fin. Servicing Corp. v. Smithwick (In re Smithwick)*, 121 F.3d 211 (5th Cir. 1997). In *Smithwick*, the creditor held an oversecured claim on the debtors' mobile home with a contract interest rate of 12.75%. The bankruptcy court's local rule provided that the interest rate on deferred payments through a confirmed chapter 13 plan was the national prime rate plus a risk factor of 2%. The *Smithwick* Court held that the correct rate of post-confirmation interest is a factual determination reviewed for clear error, but adopted the

presumptive contract rate as it "balances the competing considerations of maximizing judicial economy and ensuring an accurate reflection of the costs and risks associated with the secured lender's forced extension of credit in the Chapter 13 Plan." *Id.* at 215. The Fifth Circuit further stated that "the creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk," and that "a supplier of capital, no less than a supplier of seeds or combines, is entitled to the market price." *Id.* at 214 (citing *Koopmans v. Farm Credit Servs. of Mid-America*, 102 F.3d 874, 875-76 (7th Cir. 1996)). So, unless and until *Smithwick* was superseded by statute or overruled by the United States Supreme Court or an *en banc* holding of the Fifth Circuit, oversecured creditors were entitled to post-confirmation interest at the presumptive contract rate in this judicial circuit. Other circuit courts addressing this issue reached different results, leading to a circuit split. *See, G.M.A.C. v. Valenti (In re Valenti)*, 105 F.3d 55, 64 (2d Cir. 1997)(treasury rate plus risk premium); *G.M.A.C. v. Jones*, 999 F.2d 63, 71 (3d Cir. 1993)(contract rate); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1131 (4th Cir. 1993)(creditor's rate for similar loans, but not higher than contract rate); *Household Auto. Fin. Corp. v. Burden (In re Kidd)*, 315 F.3d 671, 678 (6th Cir. 2003)(market rate for similar loans); *In re Till,* 301 F.3d 583, 592-93 (7th Cir. 2002)(contract rate), *rev'd*, 541 U.S. 465; *U.S.D.A. v. Fisher (In re Fisher)*, 930 F.2d 1361, 1364 (8th Cir. 1991)(market rate for similar loans); *Farm Credit Bank of Spokane v. Fowler (In re Fowler),* 903 F.2d 694, 698 (9th Cir. 1990)(prime rate plus risk premium; interpreting parallel chapter 12 provision); *Hardzog v. The Fed. Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858, 860 (10th Cir. 1990)(market rate for similar loans, but not higher than contract rate; interpreting parallel chapter 12 provision).

    **3. Post-Confirmation Interest under *Till***

Subsequent to the *Smithwick* decision, the United States Supreme Court resolved the split among the circuits by determining the appropriate interest rate to be applied under § 1325(a)(5)(B) in *Till,* 541 U.S. 465. In *Till*, the debtors filed a chapter 13 plan in which they proposed to retain possession of a truck and repay the creditor's claim in installments at a prime-plus rate of 9.5%, rather than the contract rate of 21%. *Id.* As noted above, prior to the Supreme Court's ruling in *Till,* courts had taken different approaches in determining the appropriate cram down interest rates, including the cost of funds approach,[5] the presumptive contract rate approach,[6] the coerced loan approach,[7] and the formula (or prime-plus) approach.[8] *Till*, 541 U.S. 465. In *Till,* the Supreme Court examined each of these alternatives and held, in a plurality opinion, that the formula (or prime-plus) approach, which begins with the prime national interest rate and adjusts for risk of nonpayment, is the appropriate method to determine the post-confirmation interest rate to be paid on secured claims under § 1325(a)(5)(B). *Id* at 477.

In selecting the prime-plus approach (the result of which has become commonly referred to as the "*Till* rate"), the Supreme Court specifically rejected the presumptive contract interest rate approach urged by the Creditor, in part because it "produces absurd results, entitling inefficient, poorly managed lenders with lower profit margins to obtain higher cramdown rates than well managed, better capitalized lenders." *Till*, 541 U.S. at 478 (internal quotation marks omitted). Further, because the presumptive contract rate approach relies heavily on a creditor's prior dealings with the debtor, similarly situated creditors may end up with vastly different cramdown rates." *Id.* Finally, the plurality rejected the presumptive contract rate approach

---

[5] The cost of funds approach sets the interest rate at the cost to the creditor to obtain the cash equivalent of the collateral from another source.

[6] The presumptive contract rate approach sets the interest rate at the contract rate.

[7] The coerced loan approach sets the interest rate at the level the creditor could obtain from new, similar loans.

[8] The formula (or prime-plus) approach sets the interest rate at the national prime rate plus a risk factor.

(along with the coerced loan and cost of funds approaches) because each of those approaches "is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Id.* at 477.

### 4. Fifth Circuit's application of *Till* in *Drive Financial*

In 2008, after *Till* and the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the Fifth Circuit revisited post-confirmation interest rates in *Drive Financial*, 521 F.3d 343. In *Drive Financial*, the Fifth Circuit also examined the extent to which *Till* controlled its analysis of this issue, as *Till* was a plurality decision in which no single opinion was joined by five Justices. *Drive Financial*, 521 F.3d at 348. In circumstances where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188 (1977)(citations and internal quotation marks omitted). The creditor argued that under this "narrowest grounds" standard, *Till* did not constitute binding precedent because the different approaches in the plurality and concurrence meant there was no discernable "narrowest ground." Because the Fifth Circuit found that the facts of *Drive Financial* were indistinguishable from those of *Till*, it conclude that the creditor's reliance on the "narrowest ground" standard was misplaced in that it was bound by the doctrine of *stare decisis* to decide *Drive Financial* in the same manner as *Till*. *Drive Financial*, 521 F.3d at 350.[9]

---

[9] The Fifth Circuit also noted that both the plurality opinion and Justice Thomas's concurrence in *Till* rejected the presumptive contract rate as being too generous to creditors, so that even if the court were to apply the *Marks* "narrowest grounds" test, neither the coerced loan nor the presumptive contract rate approaches could be used if either would "yield an interest rate higher than the prime-plus approach." *Drive Financial*, 521 F.3d at 350. In dicta, the Fifth Circuit stated that, if not for *Till*, it would have remanded the case to the bankruptcy court with instructions to recalculate the interest rate using the presumptive contract rate adopted in *Smithwick*, but such a holding would be "essentially identical to the holding of the Seventh Circuit in *Till*, which was reversed by five currently active justices on the Supreme Court." *Id.* The Fifth Circuit found such a result to be "untenable at best." *Id.*

The debtors in *Drive Financial* owned a truck, which was undisputedly worth less than the debt, but was deemed fully secured by the "hanging paragraph" that follows § 1325(a)(9) because the creditor held a purchase money security interest in the truck and the debt was incurred within 910 days of the filing of the bankruptcy petition. The contract rate of interest was 17.95%, but the debtors proposed to pay the claim at a post-confirmation interest rate of 7.5% (the accepted *Till* rate at the time in that location). Accordingly, in *Drive Financial,* the Fifth Circuit had to determine the appropriate post-confirmation cramdown interest rate on a fully-secured vehicle. Despite the difference in the degree of security (undersecured in *Till* vs. deemed fully secured in *Drive Financial*), the Fifth Circuit found the case to be factually indistinguishable from *Till*, and held that the *Till* rate applied in the calculation of post-confirmation interest required under § 1325(a)(5)(B)(ii). *Drive Financial*, 521 F.3d at 350. Other courts that have considered this issue have reached the same conclusion. *See, e.g., Garner,* 663 F.3d at 1221; *In re Grunau*, 335 B.R. 334, 336 (Bankr. M.D. Fla. 2006)("A plan that modifies a secured creditor's rights over the creditor's objection is, in fact, a cramdown that triggers the *Till* requirement); *In re Scruggs*, 342 B.R. 571, 575 (Bankr. E.D. Ark. 2006)("[T]he interest rate in the original contract is irrelevant, and the plan must provide for payment of interest in accordance with *Till*).

### 5. Post-Confirmation Interest after *Drive Financial*

The Creditor relies on a prior decision of my learned predecessor and his interpretation of *Drive Financial* in urging the Court to calculate post-petition interest on secured claims at the contract rate. *In re Fondren,* 398 B.R. 553 (Bankr. N.D. Miss. 2008). In *Fondren*, the court considered the appropriate interest rate to be paid to oversecured creditors through a debtor's chapter 13 plan, and concluded that "[c]hapter 13 debtors who are required to pay oversecured

11

claims through their plans presumptively must pay the contract rate of interest." *Id.* at 556. He believed this result to be mandated by *Smithwick*, which he concluded was still binding precedent due to his finding that the factual scenarios of *Till* and *Drive Financial* were dissimilar to those in *Smithwick* and *Fondren* because of the oversecured nature of the creditors' claims in *Smithwick* and *Fondren*. *Id*. While I give significant consideration and great weight to prior decisions of my predecessor, I read *Drive Financial* differently.[10] I interpret *Drive Financial* to stand for the proposition that the Fifth Circuit has recognized that *Smithwick* was overruled by *Till* on this issue, at least in cases that are factually identical or substantially similar to *Till*. Because the extent of a creditor's secured status is irrelevant with regard to post-confirmation interest, this is one of those cases.

The Fifth Circuit specifically enumerated the following similarities in finding that *Till* and *Drive Financial* were indistinguishable on the essential facts: (1) the debtors in both cases filed for relief under chapter 13; (2) both sought to use the cram down option to approve a chapter 13 plan over their secured creditors' objections; (3) the creditors in both cases claimed that they should have been paid their respective contract rates of interest; (4) both bankruptcy courts held that prime-plus interest was appropriate on the respective secured claims; (5) the prime-plus interest rate in each case was considerably lower than the respective contract rate; and (6) the debtors made no appellate challenge as to the prime plus rate. *Drive Financial*, 521 F.3d at 349 n.16. To the extent these factors are known at this juncture in this case, all the same similarities exist.

---

[10] The decisions of a single bankruptcy judge do not bind bankruptcy judges of that same court, past or present. *See, e.g., In re Deboer,* 1999 W.L. 33486710, *3 (Bankr. Idaho 1999) (citing, among other cases, *In re 400 Madison Ave. Ltd. P'ship,* 213 B.R. 888, 890 n.2 (Banrk. S.D.N.Y. 1997)). Although the doctrine of *stare decisis* does not require this Court to follow the decision in *Fondren,* I do not depart lightly from its holding.

The secured status of the claims (undersecured, fully secured, or oversecured) was simply not an issue factoring into the decisions in *Till* or *Drive Financial*. In fact, the Fifth Circuit in *Drive Financial* acknowledged that *Till* made no distinction between undersecured and oversecured claims, holding that

> *Till* did not rely upon the fact that the creditor's claim had been bifurcated using section 506. The purpose of bifurcation is to determine how much of a creditor's claim is secured; then section 1325(a)(5)(B) determines what interest rate should be applied to that secured claim. In *Till,* the Supreme Court decided what interest rate was required to be paid on an objecting creditor's secured claim to ensure that the creditor receives value for its crammed down claim as required by section 1325(a)(5)(B). That is the same question presented in this case. The only difference is that *all* of Drive Financial's claim is secured, as opposed to *only a portion* of the creditor's claim being secured in *Till,* because the hanging paragraph prohibited Drive Financial's claim from being bifurcated. Drive Financial has provided no reason for why this distinction would affect *Till*'s holding regarding the proper rate of interest to be paid upon a secured claim.

*Id*. at 347 (emphasis in original).

Accordingly, it is clear that although *Till* interpreted § 1325(a)(5)(B)(ii) in a case that happened to include the strip down of a secured claim, "the statute itself is broader and applies to all cram down cases." *Wright,* 338 B.R. at 919. "Hence, the decision in *Till* is not confined merely to those cases where the value of the collateral is less than the creditor's claim." *Id.* Rather, *Till* applies in all chapter 13 cases confirmed over the objection of a secured creditor without regard to the value of the collateral in relation to the amount of its claim. *Id.*; *see also Garner,* 663 F.3d at 1219; *Taranto*, 365 B.R. at 91; *Pryor*, 341 B.R. at 652; *Grunau*, 355 B.R. at 336.

Late last year, the Fifth Circuit noted that in *Till*, "a plurality of the Supreme Court ruled that bankruptcy courts must calculate the Chapter 13 cramdown rate by applying the prime-plus formula." *Wells Fargo Bank, N.A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 331 (5th Cir. 2013). The Fifth Circuit has

13

recognized that the purpose of interest under § 1325(a)(5)(B) is to pay the present value of a claim over time so as to provide a creditor with the time value of money, and not to make a creditor whole or provide it with the benefit of its pre-petition bargain with the debtor. *Id.* Here, the modification of the Creditor's rights under its agreement with the Debtor is a result of this treatment, but it is a result contemplated and permitted by the Code – hence, why the plan at issue is a cramdown plan and not a consensual plan.

The Second, Ninth, and Eleventh Circuits agree that §§ 506(b) and 1325 together mean that "interest accrues under 506(b) only until confirmation of the plan." *Garner*, 663 F.3d at 1220 (citing *Hoopai*, 581 F.3d at 1099-1100; *Milham*, 141 F.3d at 423, 425). "On the date of confirmation, the allowed claim of an oversecured creditor is augmented by the inclusion of section 506(b) pendency interest." *Milham*, 141 F.3d at 423. Once the debtor chooses to invoke the cramdown option under § 1325(a)(5)(B), "the creditor's rights, including the rate of interest, are subject to modification in bankruptcy." *Garner*, 663 F.3d at 1220-21. The only safe harbor from modification is provided to certain home mortgages under § 1322(b)(2). *Wright*, 338 B.R. at 920. As noted by the Eleventh Circuit in *Garner*, if §§ 506(b) and 1325(a)(5)(B) both applied post-confirmation, oversecured creditors would receive a windfall. *Garner*, 663 F.3d at 1221. If interest were to accrue on a claim post-confirmation at the contract rate, the creditor would effectively be receiving "interest upon interest," and the amount it would receive under the plan would exceed the present value of its claim under § 1325(a)(5)(B). *Id.* In addition, permitting creditors to receive their contract rate of interest post-confirmation would necessarily lead to multiple creditors of the same debtor receiving different post-confirmation interest rates. It is illogical to pay a debtor's creditors different rates of interest when the creditors all have the same basis for their entitlement to post-confirmation interest – ensuring that the creditors receive the

present value of their allowed secured claims, as established on the date of confirmation. *Texas Grand Prairie*, 710 F.3d at 331; 11 U.S.C. § 1325 (a)(5)(B)(iii).

The Court holds, based on the factors enumerated by the Fifth Circuit in *Drive Financial*, that this case is factually indistinguishable from *Till* and *Drive Financial*. Thus, the Court is bound by both cases to reject the presumptive contract rate approach and apply the prime-plus formula approach in determining the post-confirmation interest rate required by § 1325(a)(5)(B).

### III. CONCLUSION

Pursuant to § 506(b) and *Laymon*, oversecured creditors are entitled to interest at the contract rate until the date a chapter 13 plan is confirmed.[11] *Laymon,* 958 F.2d at 75. Post-confirmation, however, § 506(b) has no applicability. *See, e.g., Rake;* 508 U.S. at 468; *T.H. New Orleans,* 116 F.3d at 797. Post-confirmation, all secured creditors are entitled to interest at the *Till* rate, which is the nationally recognized prime rate (currently 3.25%) plus a risk enhancement. That risk enhancement is generally recognized to be between 1% and 3%. *Texas Grand Prairie*, 710 F.3d at 332 (citing *Till*, 541 U.S. at 480). As the Debtor has proposed to pay post-confirmation interest at the locally accepted *Till* rate of 7%, the Court accepts 7% as the appropriate rate in this case.

For the reasons set forth above, it is hereby **ORDERED, ADJUDGED, and DECREED** that

1. The Creditor's Objection is **SUSTAINED IN PART and OVERRULED IN PART.**

---

[11] The Court notes that the Supreme Court's rationale in *Till* with regard to the post-confirmation interest rate may be equally applicable to the determination of the appropriate interim period interest rate. However, the Court is bound by the Fifth Circuit's earlier decision in *Laymon*, which remains the law in this circuit. *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) ("[F]or a Supreme Court decision to change our Circuit's law, it must be more than merely illuminating with respect to the case before [the court] and must unequivocally overrule prior precedent."(citations and internal quotation marks omitted)).

2. Pre-confirmation, interest will accrue on the Creditor's oversecured claim at the contract rate of 27.84%.

3. Post-confirmation, interest will accrue on the Creditor's allowed secured claim at the rate of 7%.

##END OF ORDER##